UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEREK SLOANE,

                         Plaintiff,

        -v-

W. MAZZUCA, ET AL.,

                         Defendants.

Case No. 04-CV-8266 (KMK)

OPINION AND ORDER

Appearances:

Derek Sloane
Valhalla, New York
*Pro Se Plaintiff*

Benjamin J. Lee, Esq.
New York State Office of the Attorney General
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Derek Sloane, *pro se* Plaintiff, brings this action against ten corrections officers and

officials, pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that Defendants retaliated against him

for his refusal, purportedly on religious grounds, to consent to a Purified Protein Derivative Test

("PPD Test") for the detection of latent tuberculosis ("TB") while he was incarcerated at the

Fishkill Correctional Facility ("Fishkill").  Plaintiff further alleges that he was the subject of

racially-motivated taunting and otherwise improper retaliation by prison officers.

        Defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), claiming, *inter alia*, that

Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act of

1995 ("PLRA"), 42 U.S.C. § 1997e, and that Plaintiff failed to state a claim upon which relief

can be granted.  Defendants have also moved to convert their Motion to Dismiss into a Motion

for Summary Judgment pursuant to Fed. R. Civ. P. 56, in the event that the Court must look to

materials outside the pleadings to rule on their motion.

For the reasons set forth below, Defendants' Motion to Dismiss is DENIED in part and

GRANTED in part.  Defendants' Motion for Partial Summary Judgment is GRANTED.

## I.  Background

The following facts are drawn from Plaintiff's Initial Complaint, Amended Complaint,

and all relevant attached materials.[1]

The events underlying Plaintiff's complaints all took place at the Fishkill Correctional

Facility.[2]  Plaintiff claims that he was placed on a one-year confinement hold based on his refusal

to take a PPD test while he was incarcerated at Fishkill.  (Compl. IV Statement of Claim 8.)

Plaintiff states that he refused to take the PPD test because of his religious beliefs.  (Compl. IV

Statement of Claim 3-4.)  Plaintiff insists that his religious beliefs are sincerely held, even though

---

[1]Early in the Amended Complaint, Plaintiff claims he "repeats and realleges each and every allegation set forth above."  (Am. Compl. IV Statement of Claim 5.)  Based on Plaintiff's usage of this phrase in documents he has submitted to the Court, it appears that he understands this phrase to mean that he realleges allegations made in previously submitted documents.  (Pl.'s Mem. Opp. Mot. to Dismiss 1 ("Pl.'s Resp.").)  As a *pro se* Plaintiff, Sloane is subject to a more liberal pleading standard, which requires that the Court consider factual allegations in Sloane's opposition papers to supplement allegations in his Initial and Amended Complaints.  *See Collins v. Goord*, 438 F. Supp. 2d 399, 403 n.1 (S.D.N.Y. 2006); *Fox v. Fischer,* No. 04 Civ. 6718, 2005 WL 1423580, at *2 n.1 (S.D.N.Y. June 14, 2005); *Verley v. Goord,* No. 02 Civ. 1182, 2004 WL 526740, at *5 (S.D.N.Y. Jan. 23, 2004).  Therefore, the Court will consider facts alleged in the Complaint, Amended Complaint, and opposition papers as long as there is no disagreement between the documents.

[2]Sloane is currently an inmate at the Westchester County Jail.

he failed to identify his religion in his Initial Complaint or Amended Complaint, and he failed to

explain why his religion prohibits him from taking a PPD test.  (Hr'g Tr. 9-11, Aug. 22, 2006.)

Plaintiff alleges that on March 23, 2003, he was transferred from the Clinton Correctional

Facility to the Fishkill secure housing unit ("SHU").  (Am. Compl. IV Statement of Claim 2.)  He

alleges that the PPD test was administered on May 8, 2003 (Compl. IV-A 9), and that after he

refused the test, he was placed in a confinement cell.  (Compl. IV Statement of Claim 8.)[3]

Plaintiff was subsequently transferred to the Elmira Correctional Facility in early 2004.

Sloane claims that after he refused to take the PPD test, several prison officials and

officers conspired to retaliate against him on the basis of his religion and race.  He named ten

defendants[4] to this action:  Superintendent William Mazzuca, Deputy Superintendent for Security

R. Ercole, Lieutenant Michael Melton,[5] Lieutenant V. Lopiccolo, Sergeant K. Conklin, and

---

[3]The exact duration of Plaintiff's hold in the SHU is unclear.  Plaintiff claimed on April 2, 2004, in a grievance filed from the Elmira Correctional Facility ("Elmira"), that he has been on "a t.b. hold for 2 years in the box," (Compl. Ex. Elmira Grievance 2, EL26-403-04), which is inconsistent with claims made in his Complaint where he states that he has been in the SHU since March 24, 2003.  (Compl. IV Statement of Claim 10.)

[4]The Court has adopted Plaintiff's spelling of Defendants' names.

[5]Lieutenant M. Melton was terminated as a party to this case on June 6, 2005.  (Doc. No. 19.)

Corrections Officers ("CO") Michael Venne, Nick Valhos, T. Geulu,[6] R. Padgett, and R.

Woodward.[7]

Plaintiff alleges that the retaliation against him began on May 8, 2003, when CO

DiGregonio  – who is not a defendant in this action – issued Plaintiff a misbehavior ticket as a

warning for failure to comply with the PPD test requirements.[8]  (Compl. IV Statement of Claim

3.)  Plaintiff alleges that the fifteen misbehavior reports [9] issued against him between May 8,

_____

[6]Although Plaintiff lists "T. Geulu, C.O." as a Defendant in both his Complaint and
Amended Complaint, Fishkill officials are not aware of any employee by that name.  (Defs.'
Supplemental Mem. of Law in Further Supp. of the Mot. to Dismiss the Am. Compl. 1 ("Defs.'
Supplemental Mem.").)  After investigating the allegations in the Complaint, Defendants'
counsel informed Plaintiff that they believed "T. Geulu" was CO Thomas Geno.  (Benjamin J.
Lee Letter to the Court, Feb. 18, 2005.)  Nonetheless, Plaintiff has continued to maintain his
allegations against the unknown Geulu and has dismissed Geno as a defendant in the Amended
Complaint.  (Am. Compl. 1.)

[7]Plaintiff's Initial Complaint lists Mazzuca, Ercole, Valhos, Padgett, Venne, Conklin,
Woodward, Geulu and Melton in Section III of the Complaint, which is where the Plaintiff is
required to name the "Parties" to the action.  (Compl. 3.)  The form Plaintiff used to prepare his
Complaint warns Plaintiff to:  "Make sure that the defendant(s) listed above are identical to those
contained in the caption on page 1."  (*Id.*)  Plaintiff did not heed those instructions, because the
caption does not include Melton's name.  (Compl.)  Furthermore, Plaintiff identified only
Mazzuca, Melton and Lopiccolo in Section III of his Amended Complaint, but Mazzuca, along
with Ercole, Valhos, Padgett, Venne, Conklin, Geulu and Woodward appear on the caption page.
(Am. Compl.)  Adding further confusion, in the body of Plaintiff's Amended Complaint, he lists
the following Defendants:  Mazzuca, Ercole, Melton, Lopiccolo, Valhos, Venne, and Geulu,
while dismissing Geno as a Defendant.  (Am. Compl. 1.)

[8]Records incorporated into the Amended Complaint indicate that CO DiGregonio issued
Plaintiff a misbehavior ticket on May 8, 2003.  (Am. Compl. Ex.)  At 8:15 a.m., CO DiGregonio
ticketed Plaintiff for making threats, harassing corrections staff, and refusing to obey a direct
order.  (*Id.*)  Sergeant Conkling also issued Plaintiff a misbehavior ticket on the same day at
10:35 a.m., charging Plaintiff with making threats and refusing to obey a direct order.  (*Id.*)

[9]Plaintiff's misbehavior reports, grievances, and grievance appeals are all either
incorporated by reference or attached as supplemental exhibits to the Amended Complaint.
When citing these documents, the Court will generally refer to the corresponding exhibits in the
Lee Declaration, where the documents are reprinted, as they are well organized in that

2003, and January 9, 2004, constitute a pattern of retaliation against him by prison officials and

corrections officers[10] on account of his religion.[11]  (Compl. IV Statement of Claim 4.)  In addition

to the various misbehavior reports which were filed against him, Plaintiff alleges that Defendants

Mazzuca and Ercole "ran a campaign" of harassing him in retaliation for refusing to take the

PPD test.  (Compl. IV Statement of Claim 6.)

---

submission.

[10]Plaintiff's misbehavior reports, with issuing officer's name, are listed here for
completeness: (1) May 8, 2003, 8:15 a.m. (CO DiGregonio):  Plaintiff made threats, harassed
corrections staff, and refused to obey a direct order; (2) May 8, 2003, 10:35 a.m. (Sgt. Conklin):
Plaintiff failed to promptly follow a direct order, engaged in threats and verbal harassment; (3)
June 26, 2003, 8:45 a.m. (CO Straley):  Plaintiff engaged in violent conduct, disturbed the
facility, and disobeyed a direct order; (4) July 14, 2003, 9:00 a.m. (CO Manning):  Plaintiff
destroyed, altered, and tampered with state property; (5) July 14, 2003, 2:50 p.m. (CO Phillips):
Plaintiff destroyed, altered, and counterfeited property; (6) July 28, 2003, 9:00 a.m. (CO
Manning):  Plaintiff damaged state property; (7) July 29, 2003, 9:00 a.m. (CO Manning):
Plaintiff damaged state property; (8) August 18, 2003, 2:13 p.m. (CO Laporte):  Plaintiff engaged
in conduct that disturbed the order of the facility; (9) October 14, 2003, 4:50 p.m. (CO Venne):
Plaintiff engaged in harassment and threats; (10) November 9, 2003, 11:10 p.m. (CO Venne):
Plaintiff obstructed visibility of his cell and kept an unclean cell; (11) November 21, 2003, 10:35
a.m. (Sgt. Conkling):  Plaintiff lied, destroyed state property, and obstructed visibility of his cell;
(12) December 31, 2003, 11:15 a.m. (CO Padgett): Plaintiff failed to promptly obey orders,
obstructed the visibility of his cell, and kept an unclean cell; (13) January 7, 2004, 12:45 p.m.
(CO Valhos): Plaintiff refused to obey a direct order, interfered with an employee, and failed to
comply with mess hall policies; (14) January 9, 2004, 7:15 a.m. (CO Valhos):  Plaintiff engaged
in threats, violent and disturbing conduct, interfered with an employee, and wasted food; (15)
January 9, 2004, 9:08 a.m. (CO Padgett):  Plaintiff refused to obey a direct order, interfered with
an employee, and failed to follow staff directions.  (Lee. Decl. Ex. C.)

[11]In his pleadings, Plaintiff failed to identify what religion required his refusal to take the
PPD test, let alone what religious basis he relied upon in refusing the test.  At oral argument,
Plaintiff indicated that he was a Muslim, however, when asked which sect of Islam he followed
(Shia or Sunni), Plaintiff merely claimed that he was an "American Muslim."  (Hr'g Tr. 10-11.)
Further, Plaintiff could not cite at oral argument, any religious text, such as the Koran, which
prohibited him from taking the PPD test.  (*Id*. at 11.)

Plaintiff asserts that in addition to religiously-motivated retaliation, he was subjected to racially-motivated retaliation.  Plaintiff claims that Defendants issued misbehavior citations in response to his filing grievances against members of the prison staff, which Plaintiff identifies as part of a "pattern of harassing ethnic minorities."  (Compl. IV Statement of Claim 5-6, 9.)

In his Amended Complaint, Plaintiff qualified and expanded his retaliation claim, stating that although he could "not say actually if [the guards retaliated against him] for his religious beliefs," he had determined that there were several other reasons why Defendants retaliated against him.  (Am. Compl. IV Statement of Claim 3 (extraneous punctuation omitted).)  For example, Plaintiff claims that Defendants retaliated against him because he was scheduled to come before the parole board, and in order to adversely affect his parole hearing, the Defendants taunted him with "a variety of alleged misdeeds."  (Am. Compl. IV Statement of Claim 4-7.)

_____ During approximately the same period of time that Sloane claims he was retaliated against, he filed twelve inmate grievances, and appealed five of these grievances to the Central Office Review Committee ("CORC").[12]  (Lee Decl. Exs. A, B.)  Sloane claims that these

_____

[12] Sloane's twelve grievances were as follows: (1) April 3, 2003:  inmate grievance FCF 24097-03, alleging a denial of legal copies.  This grievance was appealed to the CORC, which issued a final determination on May 28, 2003; (2) April 14, 2003:  inmate grievance FCF 24114-03, alleging insufficient supplies in S-block.  This grievance was appealed to the CORC, which issued a final determination on June 4, 2003; (3) April 24, 2003:  inmate grievance FCF 24160-03, alleging misplacement of his legal documents.  This grievance was appealed to the CORC, which issued a final determination on June 25, 2003; (4) May 9, 2003:  inmate grievance FCF 24171-03, alleging denial of supplies and a racist remark concerning slavery made by prison staff; (5) June 10, 2003:  inmate grievance FCF 24248-03, alleging denial of legal copies; (6) June 24, 2003:  inmate grievance FCF 24296-03, alleging prison staff listened to his privileged tape; (7) July 22, 2003:  inmate grievance FCF 24372-03, alleging a request to type legal documents was not granted; (8) September 11, 2003:  inmate grievance FCF 24520-03, alleging denial of library materials; (9) September 18, 2003:  inmate grievance FCF 24522-03, alleging CO Venne made an inappropriate comment to Plaintiff.  This grievance was appealed to the CORC, which issued a final determination on October 22, 2003; (10) January 14, 2004:  inmate

grievances themselves prompted retaliation by prison officials who conspired to "find grounds for issuing tickets" against him.  (Am. Compl. IV Statement of Claim 4.)

Only two of the five grievances appealed by Sloane – FCF 24866-04 and FCF 24522-03 – postdated Sloane's refusal to take the PPD test and were appealed to the CORC.  In neither of these two grievances did Plaintiff allege any religious-based retaliation.  In grievance FCF 24866-04, Plaintiff accused Defendants Conklin, Geulu, Padgett, Valhos, and Woodward of participating in a "racially motivated incident" in which Conklin allegedly threw a breakfast tray at Plaintiff.  (Lee Decl. Ex. B.)  Plaintiff further accused Valhos of engaging in a "cover-up" to protect Defendant Conklin.  (*Id.*)  Plaintiff also alleged a "pattern of . . . persistent racial taunting" fueled by a conspiracy among the named officers and Mazzuca and Ercole to keep the "incidents alive."  (*Id.*)  Plaintiff made no indication in this grievance that prison staff were retaliating against him because of his religion.  On appeal, the CORC concluded that Plaintiff "has not substantiated his claim that he has been the victim of harassment by staff nor has sufficient evidence been produced to support such a conclusion."  (*Id.*)

In grievance FCF 24522-03, Sloane claimed that "a white officer" responded to Sloane with, "That(s) a good boy [sic]," after Sloane had complied with the officer's command to take down a towel which was obstructing a clear view of Sloane's cell.[13]  (*Id.*)  Plaintiff made no

---

grievance FCF 24865-04, alleging an unidentified officer spit in his food; (11) January 14, 2004: inmate grievance FCF 24866-04, alleging prison staff threw a food tray at him.  This grievance was appealed to the CORC, which issued a final determination on March 3, 2004; (12) April 2, 2004:  While at Elmira, Plaintiff filed inmate grievance EL26-403-04, alleging his TB confinement constituted religious discrimination.  (Lee Decl. Exs. A, B.)

[13]Reports collected by the New York State Department of Correctional Services' ("DOCS") subsequently identified CO Venne as the alleged offending officer.  (Lee Decl. Ex. B.)

allegation in his grievance that this incident was spurred by Plaintiff's religious beliefs.  After reviewing the results of an investigation into Sloane's allegations, the CORC determined that Sloane's appeal was "without merit."  (*Id.*)

## II.  Discussion

### A.  Legal Standard

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint via reference.  *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996) (citation omitted).  Where a party proceeds *pro se*, the Court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Davis v. Kelly*, 160 F.3d 917, 922 (2d Cir. 1998) ("Though a court need not act as an advocate for *pro se* litigants, in *pro se* cases there is a greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done."  (quotation and citation omitted)).  However, even when assessing a *pro se* plaintiff's claim under the Rule 12(b)(6) standard, "a conclusory allegation . . . without evidentiary support or allegations of particularized incidents, does not state a valid claim."  *Butler v. Castro*, 896 F.2d 698, 700 (2d Cir. 1990).

When a court considers materials outside the pleadings, conversion of a motion to dismiss to one for summary judgment may be appropriate.  However, before converting a motion, the court ordinarily is to provide notice to the parties.  *See* Fed. R. Civ. P. 12(b).  In particular, the court should appraise a *pro se* litigant of the consequences of failing to adequately respond to

a motion for summary judgment.  *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir.

1999).  However, such notice, even to *pro se* plaintiffs, is not always required.  "The essential

inquiry is whether the [the parties] should reasonably have recognized the possibility that the

motion might be converted into one for summary judgment or [were] taken by surprise and

deprived of reasonable opportunity to meet facts outside the pleadings."  *Gurary v. Winehouse*,

190 F.3d 37, 43 (2d Cir. 1999) (internal quotation marks omitted).

On August 22, 2006, the Court engaged Plaintiff in a colloquy, in which the Court made

clear that Defendants were seeking to convert their Motion to Dismiss into one for summary

judgment, particularly relating to the question of exhaustion of administrative remedies.  (Hr'g

Tr. 3-4.)  Plaintiff acknowledged that he understood that Defendants were pursuing a Motion for

Summary Judgment in the alternative when he filed his Opposition to Summary Judgment.  (*Id.*)

Indeed, Plaintiff's responding papers expressly discuss summary judgment standards.  (Pl.'s

Reply Opp'n.)  Furthermore, Defendants alerted Plaintiff, pursuant to Local Civil Rule 12.1, that

they would seek to convert their Motion to Dismiss into one for summary judgment.  (Local Rule

12.1 Notice to Pro Se Litigant Opposing Mot. Dismiss Treated as Mot. Summ. J.)  Other district

courts have converted motions to dismiss into motions for summary judgment in PLRA cases

where, as here, it is clear to both parties that Court likely will convert the motion, particularly as

it relates to the question of proper exhaustion of administrative remedies.  *See Collins*, 438 F.

Supp. 2d at 411-12 (collecting cases).  Thus, the Court may apply summary judgment principles

to the exhaustion question.  *See McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003)

("[N]onexhaustion should be resolved as early as possible by the court.").

A motion for summary judgment, pursuant to Fed. R. Civ. P. 56(b) and (c), "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The burden is on the movant to show that there is no genuine factual dispute.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).  All reasonable inferences must be made in the non-movant's favor.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted."  *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286-87 (2d Cir. 2003)); *see also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).  The genuine issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

### B.  Exhaustion of Administrative Remedies

Before the Court turns to Defendants' Motion to Dismiss for failure to state a claim, the Court considers whether Plaintiff has exhausted all available administrative remedies.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail,

10

prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  As noted by the Supreme Court, Congress enacted the PLRA to "reduce the quantity and improve the quality of prisoner suits" by allowing prison officials to initially address prisoner complaints through internal processes.  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  The PLRA's exhaustion requirement "applies to all inmate suits about prison life," including the constitutional and retaliation complaints alleged by the Plaintiff here.  *Id.* at 532.

Exhaustion is not a jurisdictional predicate, *see Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003), but an affirmative defense.  *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999).  "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity."  *McCoy*, 255 F. Supp. 2d at 248; *accord Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 677 (4th Cir. 2005) (summarizing law of the majority of circuits, including the Second Circuit, which holds that exhaustion of administrative remedies under the PLRA is not a pleading requirement).  Nonetheless, a complaint may be dismissed if plaintiff's failure to exhaust administrative remedies is apparent from the face of the complaint.  *See Anderson*, 407 F.3d at 682; *McCoy*, 255 F. Supp. 2d at 249, 251.  However, "[b]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss."  *Nicholson v. Murphy*, No. 302 Civ. 1815, 2003 WL 22909876, at *6 (D. Conn. Sept. 19, 2003); *see also McCoy*, 255 F. Supp. 2d at 249-50 ("[I]f, as is usually the case, it is not clear from the face of the complaint whether the plaintiff exhausted, a [motion to dismiss] is not the proper vehicle.").

11

"Rather, the defendants must present proof of non-exhaustion." *Nicholson*, 2003 WL 22909876, at *6.

This past Term, the Supreme Court considered the PLRA's exhaustion requirement and held that, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, --- U.S. ---, 126 S. Ct. 2378, 2385 (June 22, 2006) (footnote omitted).  Thus, the Court's decision requires that there be "proper exhaustion," *id*. at 2385, before a case may succeed in federal court.  Concurring in the judgment, Justice Breyer left open the possibility that the Court's adoption of the "proper exhaustion" requirement of the PLRA may still allow for exceptions to exhaustion recognized by the Second Circuit.  *Id*. at 2393 (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir. 2004)).

In the Second Circuit, a district court must consider three factors before the court can decide whether the prisoner has failed to exhaust available administrative remedies.  Those three factors are:  (1) whether administrative remedies were "available" to the prisoner; (2) whether the defendants are estopped from asserting an exhaustion defense; and (3) whether special circumstances exist that excuse the prisoner from the exhaustion requirements.  *See Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir. 2006); *Hemphill v. New York*, 380 F.3d 680, 686-92 (2d Cir. 2004); *Giano*, 380 F.3d at 677.

The Second Circuit has not addressed how the three-part approach outlined above has been affected by *Woodford*.  In fact, just before the issuance of this Opinion, the Second Circuit declined to "determine what effect *Woodford* has on [its] case law in this area." *Ruggiero v. County of Orange*, --- F.3d ----, No. 05-4774-cv, 2006 WL 2973034, at *4 (2d Cir. Oct. 18, 2006).  Until such time as the Court of Appeals considers the impact of *Woodford*, if any, on its

12

prior rulings, this Court must follow the law of the Second Circuit.  The Court will therefore apply the current law of this Circuit to the exhaustion claims.[14]  *See Collins*, 438 F. Supp. 2d at 411 n.13 (noting *Woodford*'s potential impact on the law of the Second Circuit but deciding exhaustion claims under the Second Circuit's three-part inquiry); *Hernandez v. Coffey*, No. 99 Civ. 11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same).  The three-part exhaustion test is discussed in *seriatim*.

### 1.  Whether Administrative Remedies were "Available" to the Prisoner

Before dismissing a complaint filed under the PLRA for failure to exhaust, the Court must "establish the availability of an administrative remedy from a legally sufficient source." *Snider v. Melindez*, 199 F.3d 108, 114 (2d Cir. 1999).  "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.'"  *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).  In making this determination, "courts should be careful to look at the applicable set of grievance procedures."  *Id.* at 668 (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)); *see also Taylor v. New York City Dep't of Corr.*, No. 03 Civ. 1929, 2004 WL 2979910, at *6 (S.D.N.Y. Dec. 22, 2004).

In some circumstances, a defendant's behavior will render an administrative remedy unavailable.  *See Hemphill*, 380 F.3d at 687.  "Exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from

---

[14]In any event, the Court does not believe that anything in *Woodford* would change the result in this case.  *See Ruggiero*, 2006 WL 2973034, at *4 ("[Appellant] could not have prevailed even under [the Circuit's] pre-*Woodford* case law.").

seeking his administrative remedies." *Abney*, 380 F.3d at 667 (citation omitted); *see also*

*Hemphill*, 380 F.3d at 688-89 (determining that threats from guards which prevent the filing of a

grievance would make the remedy unavailable) (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d

Cir. 2004)).  Additionally, an administrative remedy is unavailable in "instances where the

prisoner obtains a favorable disposition of his grievance, only to find, after the time for filing an

administrative appeal has expired, that the relief he had won was not forthcoming." *Giano*, 380

F.3d at 677 (citation omitted).

    In this case, the administrative procedures that *Woodford* requires Plaintiff to properly

exhaust are the administrative procedures established by DOCS.  The DOCS program includes a

three-step administrative mechanism called the Inmate Grievance Program ("IGP"), which

provides an avenue for prisoners to resolve complaints about the conditions of their

incarceration.  *See* N.Y. Correct. Law § 139.  The IGP requires that an inmate first file a

complaint with the Inmate Grievance Review Committee ("IGRC") within fourteen days of the

challenged event.[15]  *See* 7 N.Y.C.R.R. § 701.7(a)(1); *see also Collins*, 438 F. Supp. 2d at 410.

The IGRC must then respond within seven days.  *See* 7 N.Y.C.R.R. § 701.7(a)(3).  The inmate

may then appeal an adverse IGRC decision to the superintendent of the facility.  *Id*. at 701.7(b);

*see also Collins*, 438 F. Supp. 2d at 410.  Finally, the inmate may appeal to the DOCS CORC.

*See* 7 N.Y.C.R.R. § 701.7(c); *see also Collins*, 438 F. Supp. 2d at 410.  The IGP also permits

---

[15]Although an inmate has fourteen calendar days from the date of an incident to file a
grievance, the IGP supervisor may toll the deadline on the basis of "mitigating circumstances."  7
N.Y.C.R.R. § 701.7(a)(1); *Hemphill*, 380 F.3d at 682 n.3.  In this case, neither Plaintiff nor
Defendants argue that the fourteen-day time period was waived or tolled in any of Plaintiff's
grievances.

"matters not decided within the time limits [to] be appealed to the next step."  7 N.Y.C.R.R. §

701.8.  A few aspects of prison life, such as complaints concerning outside agencies, are not

grievable.  *See* 7 N.Y.C.R.R. § 701.3(f).  However, an inmate may otherwise grieve "virtually

any issue affecting their confinement."  *Flanagan v. Maly*, No. 99 Civ. 12336, 2002 WL 122921,

at *1 (S.D.N.Y. Jan. 29, 2002) (citations omitted).

### 2.  Estoppel

Under the Second Circuit's three-part inquiry, the Court must also inquire as to "whether

the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or

preserve it . . . or whether the defendants' own actions inhibiting the inmate's exhaustion of

remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust

as a defense."  *Hemphill*, 380 F.3d at 686 (citations omitted).  Under this analysis, for example,

the Second Circuit has held that defendants may be estopped from raising a non-exhaustion

affirmative defense where prison officials prevented an inmate from exhausting his

administrative remedies.  *See Ziemba*, 366 F.3d at 162-63 (estopping defendants where they had

prevented exhaustion of remedies by beating and threatening the inmate, denying him grievance

forms, and transferring him to another prison).

### 3.  Special Circumstances

Next, the Court must consider any special circumstances which may have frustrated an

inmate's grievance.  In *Giano*, the Second Circuit determined that "there are certain 'special

circumstances' in which, though administrative remedies may have been available and though

the government may not have been estopped from asserting the affirmative defense of non-

exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." 380 F.3d at 676 (citations omitted). In *Giano*, the plaintiff's reasonable interpretation of DOCS regulations constituted the "special circumstances" justifying his failure to exhaust. *Id.*

C.  Exhaustion Analysis

Defendants do not argue, and they would be unsuccessful if they did, that it is apparent from the face of the Complaints (and Plaintiff's other pleadings) that Plaintiff has not properly exhausted his administrative remedies. Instead, in support of their claim that Plaintiff has not properly exhausted his administrative remedies, Defendants submit documents and affidavits beyond Plaintiff's pleadings. Plaintiff has responded in kind with references to documents outside the pleadings he has filed. And, as previously noted, Plaintiff has acknowledged that he was on notice that Defendants' motion regarding the exhaustion claim could (and should) be converted to a summary judgment motion. Accordingly, the Court will consider the additional items submitted by the parties and evaluate the exhaustion claim under summary judgment principles. *See Taylor*, 2004 WL 2979910, at *4 (converting defendants' motion to dismiss to one for summary judgment where defendants submitted additional documents and Plaintiff was on notice of possibility of conversion of motion).

Defendants argue that many of Plaintiff's grievances were not properly exhausted, and they offer the sworn declaration of Karen Bellamy ("Bellamy Decl."), the Assistant to the Director of the Inmate Grievance Program at DOCS, to carry their burden of demonstrating non-exhaustion. Bellamy is responsible for "maintaining records of appeals of grievances filed by inmates" and she "oversee[s] the computer records that DOCS maintains of all appeals made to

16

the Central Office Review Committee . . . ."  (*Id.* ¶ 2)  DOCS' Directive #4040 "requires that grievance files and logs be maintained for at least the current year plus the previous four calendar years."  (*Id.* ¶ 3)  Furthermore, the CORC maintains grievance appeals to CORC dating back to 1990.  (*Id.*)  "[R]etaliation and conspiracy [claims] may be grieved through the inmate grievance program."  (*Id.* ¶ 5)

It is clear based on Defendants' submissions, which Plaintiff does not contest, that administrative remedies were available to Sloane under the IGP.  There is also nothing in the record that suggests that Sloane's efforts to utilize the IGP were frustrated by prison officials.[16]  Therefore, the first part of the exhaustion test has been met; administrative remedies were available to Sloane.

The second part of the exhaustion test asks if Defendants are estopped from raising exhaustion as a defense.  Here, they are not.  Defendants first raised the PLRA exhaustion defense in their Motion to Dismiss.  (Defs.' Mem. of Law in Supp. of their Mot. to Dismiss the Compl. 7-9)  Other courts in this district have held that an exhaustion defense was not waived when defendants timely raised the defense in their second amended answer.  *See Legal Aid Soc'y*

---

[16]The Court notes that Plaintiff was transferred in early 2004 to Elmira "due to inappropriate behavior."  (Lee Decl. Ex. B.)  Although in *Ziemba*, the Second Circuit noted that the transfer of a prisoner contributed to a pattern of behavior which estopped the defendants from raising the non-exhaustion defense, 366 F.3d at 162-64, a number of courts have determined that transfer by itself does not prevent a Plaintiff from exhausting available administrative remedies.  *See, e.g.*, *Sims v. Blot*, No. 00 Civ. 2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Thomas v. Henry*, No. 02 Civ. 2584, 2002 WL 922388, at *2 (S.D.N.Y. May 7, 2002) (finding transfer of prisoner from a city to a state prison did not relieve him of obligation to pursue the grievance procedures); *Santiago v. Meinsen*, 89 F. Supp. 2d 435, 440-41 (S.D.N.Y. 2000) (determining that Plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred).

*v. City of New York*, 114 F. Supp. 2d 204, 222 (S.D.N.Y. 2000).  In this case, Defendants have exceeded that standard, and asserted the exhaustion defense in both their Motion to Dismiss the initial Complaint, and their Motion to Dismiss the Amended Complaint.  (Defs' Supplemental Mem. 8-12)  In addition, Defendants have not prevented Plaintiff from pursuing the available administrative remedies, and Plaintiff has not argued otherwise.  *See Hernandez*, 2006 WL 2109465, at *4 (citations omitted).

The third part of the exhaustion test has also been satisfied.  There are no special circumstances which would excuse Plaintiff from availing himself of administrative remedies.  Plaintiff has not asserted that he was inhibited in his pursuit of administrative remedies, nor has he suggested that his interpretation of DOCS regulations differed from that of prison officials, as in *Giano*.

All of Plaintiff's claims in this action could have been pursued through the IGP, and since none of the three factors the Court must consider excuses Plaintiff's failure to properly exhaust his remedies, the Court must now determine which of Plaintiff's claims were properly exhausted.  From the materials submitted by Defendants, most of which are either attached or referred to in Plaintiff's Complaints, it is evident that Plaintiff filed a total of twelve grievances through the IGP.  (Lee Decl. Exs. A, B.)  These twelve grievances can be placed into three categories.  The first category consists of grievances which Plaintiff filed before the alleged date of the PPD test.  The second category consists of grievances which were filed but not appealed, and therefore, not properly exhausted.  The third category is comprised of properly exhausted grievances.

### 1.  Grievances Which Pre-date the PPD Test

Plaintiff attached a number of grievances to his Initial Complaint, three of which pre-date Plaintiff's assertion that prison officials conspired to retaliate against Plaintiff for refusing to take the May 8, 2003, PPD test.[17]  In those grievances, Plaintiff claimed, respectively, that he was denied access to his legal files, that the S-block facility did not stock adequate office supplies, and that Plaintiff's legal documents were misplaced.  (Lee Decl. Ex. A.)  Since all of these events took place before Plaintiff refused the PPD test, they could not have been in retaliation for his refusal of the test, nor could they all be part of a conspiracy aimed at harming Plaintiff for refusing the test.[18]  In addition, Plaintiff has not alleged that he sustained any injury as a result of the conduct underlying these grievances, which means that section 1983 is not available to him as a remedy for these instances of alleged misconduct.  *See Moore v. Gardner*, 199 F. Supp. 2d 17, 28 (W.D.N.Y. 2002) (denying section 1983 claim for confiscation of legal papers because plaintiff sustained no injury).

### 2.  Claims Not Exhausted

Defendants argue that most of Plaintiff's claims were not fully exhausted and in support, they have offered a computer printout which lists all of Plaintiff's grievances which were appealed to CORC.  (Bellamy Decl. Ex. A.)  Based on that computer record, Defendants contend that "the only grievances that inmate Sloane has appealed at Fishkill Correctional Facility after

---

[17]The three grievances, filed on April 3, 2003, April 14, 2003, and April 24, 2003, were FCF 24097-03, FCF 24114-03, and FCF 24160-03, respectively.  (Lee Decl. Ex. A.)

[18]Though not dispositive, the April 3 and April 14 grievances were granted, which would seem to undermine Plaintiff's claims that he was the victim of a conspiracy.  (Lee Decl. Ex. A.) Furthermore, Plaintiff has not argued at any point that the denial of access to his legal files or access to supplies has hindered his ability to exhaust his administrative remedies.

19

May 8, 2003 . . . are one grievance for alleged inappropriate comments by a corrections officer (FCF 24522-03) and a grievance for a food tray allegedly being thrown at him (FCF 24866-04)."[19] (Bellamy Decl. ¶ 6.)  Plaintiff has not challenged Defendants' claim that only these two grievances were appealed to the CORC, and, therefore, the remaining grievances were not fully exhausted.  *See Woodford*, 126 S. Ct. at 2385 (defining proper exhaustion); *Gibson v. Goord*, 280 F.3d 221, 224 (2d Cir. 2002) (noting that unappealed grievances are deemed to be unexhausted grievances).  The Court agrees with Defendants that only two of Plaintiff's grievances were fully exhausted.

The impact of Plaintiff's failure to exhaust his administrative remedies is fatal, because the gravamen of Plaintiff's complaint in this section 1983 action is found in a grievance Plaintiff filed at Elmira – EL 26403-04 – which was not fully exhausted.  This is the only grievance alleging that Plaintiff's TB confinement constituted religious discrimination.  (Lee Decl. Ex. A.)

### 3.  Properly Exhausted Claims

Defendants concede that two of Plaintiff's grievances were properly exhausted.  On September 18, 2003, Plaintiff filed inmate grievance FCF 24522-03, alleging that CO Venne made an inappropriate comment to Plaintiff.  This grievance was appealed to the CORC, which issued a final determination on October 22, 2003.  (Bellamy Decl. Ex. A.)  On January 14, 2004,

---

[19]Plaintiff failed to exhaust his remedies for the following grievances:  (1) May 9, 2003: Plaintiff filed inmate grievance FCF 24171-03, alleging denial of supplies and a racist remark concerning slavery made by prison staff; (2) June 10, 2003: Plaintiff filed inmate grievance FCF 24248-03, alleging denial of legal copies; (3) June 24, 2003: Plaintiff filed inmate grievance FCF 24296-03, alleging prison staff listened to his privileged tape recording; (4) July 22, 2003: Plaintiff filed inmate grievance FCF 24372-03, alleging a request to type legal documents was not granted; (5) September 11, 2003: Plaintiff filed inmate grievance FCF 24520-03, alleging denial of library materials; (6) January 14, 2004: Plaintiff filed inmate grievance FCF 24865-04, alleging an unidentified officer spit in his food.

Plaintiff filed inmate grievance FCF 24866-04, alleging that prison staff threw a food tray at him. (*Id.*)  This grievance was appealed to the CORC, which issued a final determination on March 3, 2004.  (*Id.*)  Since these two grievances were the only fully exhausted grievances, the Court will limit Sloane, in accord with the PLRA, to claims raised in grievances FCF 24522-03 and FCF 24866-04.  The Court cannot consider any allegation by Sloane made in his complaints or papers that does not appear in either grievance.

### D.  Individual Defendants

The Court now turns to the question of which of the named Defendants were identified by Sloane in his two exhausted grievances.  The allegation of a defendant's personal involvement in any alleged constitutional violation is a prerequisite to a damage award for personal injury under section 1983.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  In Plaintiff's two properly exhausted grievances, he names seven individuals, but Defendants Melton and Lopiccolo are not among them.  Because Plaintiff failed to name Melton or Lopiccolo in either grievance, claims against these Defendants are dismissed.  *See Roper v. Hynes*, No. 05 Civ. 7664, 2006 WL 2773032, at *9 (S.D.N.Y. Sept. 27, 2006) (dismissing section 1983 action for lack of personal involvement) (citing *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir. 1987)); *Luckerson v. Goord,* No. 00 Civ. 9508, 2002 WL 1628550, at *2 (S.D.N.Y. July 22, 2002) (finding that litigating a federal suit based on allegations that were never made at the administrative level would make a "mockery of the exhaustion requirement").

Plaintiff also makes allegations against Superintendent Mazzuca and Deputy Superintendent for Security Ercole, both of whom are properly categorized as supervisory

personnel.  The personal involvement of a supervisory official in a section 1983 action can be

established by showing that:

> (1) the defendant participated directly in the alleged constitutional
> violation, (2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which unconstitutional
> practices occurred, or allowed the continuance of such a policy or
> custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited deliberate indifference to the rights of inmates
> by failing to act on information indicating that unconstitutional acts
> were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).

Plaintiff's claims against the supervisory Defendants fail, as neither Defendant has been

alleged to be involved in any of the conduct underlying Plaintiff's exhausted grievances.

Plaintiff has also failed to allege that any of the five *Colon* factors for supervisory officials has

been met.  Rather, Plaintiff generally asserts that Mazzuca and Ercole "ran a campaign of

keeping incidents alive" (Compl. IV Statement of Claim 6), but he does little more than offer

conclusory statements that Mazzuca and Ercole, both of whom sit high atop the prison hierarchy,

conspired against him.  Such conclusory allegations are insufficient to sustain a claim.  *See*

*Collins*, 438 F. Supp. 2d at 420 (dismissing claim against DOCS officials who had no direct role

in subject of plaintiff's complaint (citing *Colon*, 58 F.3d at 874)); *see also Davis v. County of*

*Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005) ("A complaint that essentially regurgitates

the relevant 'personal involvement' standard, without offering any facts indicating that, or how,

an individual defendant in a supervisory role was personally involved in a constitutional

violation, cannot withstand dismissal."); *Madison v. Mazzuca*, No. 02 Civ. 10299, 2004 WL

3037730, at *10 (S.D.N.Y. Dec. 30, 2004) (dismissing "wholly conclusory" allegations of

supervisory culpability).  Therefore, any claims against Defendants Mazzuca and Ercole are dismissed.  Thus, the following Defendants are the remaining parties to this lawsuit:  Sergeant Conklin, COs Venne, Valhos, Geulu, Padgett, and Woodward.

      E.  Section 1983

      To state a claim under section 1983, Plaintiff must show that defendants, while acting "under color of state law," deprived Plaintiff of his constitutional or statutory rights.  *Shabazz v. Vacco,* No. 97 Civ. 3761, 1998 WL 901737, at *2 (S.D.N.Y. Dec. 28, 1998) (citing *Pitchell v. Callan,* 13 F.3d 545, 547-48 (2d Cir. 1994)); *see also* 42 U.S.C. § 1983.

      While *pro se* complaints are to be liberally construed and interpreted "to raise the strongest argument that they suggest," *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) (citation omitted), the Court must dismiss a section 1983 complaint if it fails to set forth specific factual allegations indicating a deprivation of constitutional rights.  *See Alfaro Motors*, 814 F.2d at 887 ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983.")*; Shabazz,* 1998 WL 901737, at *2 ("[T]he court will dismiss a complaint that consist[s] of nothing more than naked assertions, and set[s] forth no facts upon which a court could find a [constitutional] violation.") (citations and quotation marks omitted).  The Second Circuit has "repeatedly held, [that] complaints relying on . . . civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."  *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987).

_____ 1.  Inappropriate Comments

Plaintiff alleges that he was the target of an inappropriate comment by a "white officer," who was later identified by DOCS to be CO Venne.  Plaintiff alleges that after he complied with CO Venne's directive to remove a towel from his cell which was obstructing the officer's view into the cell, Venne responded by saying, "That(s) [sic] a good boy."

The alleged comment is not actionable under section 1983 for two reasons.  First, verbal harassment — even potentially racist harassment — "unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable under 42 U.S.C. § 1983." *Shabazz v. Pico,* 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (collecting cases) (citations and punctuation omitted); *see also Purcell v. Coughlin* 790 F.2d 263, 265 (2d Cir. 1986) (per curiam) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed." (citing *McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir. 1983)); *Ramirez v. Holmes,* 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983. ").  Second, Plaintiff has no section 1983 claim even assuming, arguendo, that there is a racial sub-text to the comment, because discriminatory statements are not actionable under section 1983. *See Wright v. Santoro,* 714 F. Supp. 665, 667 (S.D.N.Y. 1989) (noting that discriminatory statements reflecting racial prejudice are not actionable under section 1983 where not connected to any physical injury), *aff'd,* 891 F.2d 278 (2d Cir. 1989).  Therefore, this cause of action is dismissed for failure to state a claim.

### 2.  Food Tray Incident

Sloane alleges that CO Conklin threw a food tray at him in what Plaintiff says was a racially-motivated incident.  Sloane further alleges that CO Valhos participated in a "cover up" to conceal the food tray incident.  Sloane does not claim that he was struck by the tray.

The food tray incident is not actionable under section 1983.  Plaintiff has not identified which of his constitutional or statutory rights was violated by the officers.  Furthermore, physical contact that falls short of producing an injury is not actionable under section 1983.  *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (holding that plaintiff's allegations that he was "bumped, grabbed, elbowed, and pushed" did not present a viable section 1983 claim (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993))).  Here, there was no physical contact, and thus no actionable section 1983 injury.  Further, because the alleged act of throwing a food tray by itself is not actionable in the absence of any injury, neither is any alleged cover up.  Therefore, this cause of action is dismissed for failure to state a claim.

### 3.  Conspiracy

Next, Sloane alleges that he is a victim of a "pattern of . . . persistent racial taunting" which is fueled by a conspiracy to issue Plaintiff misbehavior citations as part of a scheme to keep "incidents alive."

To successfully assert a section 1983 claim for conspiracy, plaintiff must show:  (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing harm to plaintiff.  *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  The

Court is mindful, however, that "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Id.* at 72 (citation and quotations omitted).  Nonetheless, claims of conspiracy, as with all civil rights causes of action, must be plead with some specificity.  *See Roper*, 2006 WL 2773032, at *9 (noting that conspiracy claims must be plead with specificity); *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 547 (E.D.N.Y. 2004) (same).

Plaintiff has failed to allege, with any specificity, that Defendants formed an agreement to conspire against Plaintiff, or that there was a "meeting of the minds."  The mere fact that Defendants are DOCS employees, and have encountered Plaintiff on various occasions, by itself, is not sufficient to state a claim for conspiracy.  *See Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (holding that plaintiffs failed to allege in a non-conclusory manner any meeting of the minds); *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy . . . cannot withstand . . . dismiss[al].").

In addition, to the extent Plaintiff alleges that the "persistent racial taunting" he faces is verbal harassment, those claims are not actionable under section 1983.  *See supra*, Part II.E.1. Finally, Sloane's conspiracy claim also fails because he relies on unsupported, conclusory statements for his conspiracy allegation.  For example, Plaintiff has not alleged with any specificity how Defendants acted in concert to injure Plaintiff.  This mandates dismissal of this claim.  *See Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]onclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed."); *McCoy*, 255 F. Supp. 2d at 259

(allegations of conspiracy were too broad and conclusory).  Therefore, this cause of action is dismissed for failure to state a claim.

### 4.  Retaliation

Although Plaintiff's complaints and papers do not clearly allege that the conduct underlying his exhausted claims form the basis of a First Amendment retaliation claim, the Court will assume that Plaintiff has alleged retaliation.  To state a claim of retaliation for exercise of First Amendment rights, Plaintiff must make non-conclusory allegations establishing:  (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action.  *See Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006).  Because prisoners' claims of retaliation are prone to abuse, the Court approaches Plaintiff's claims with justifiable caution and some skepticism.  *See Allah v. Greiner*, No. 03 Civ. 3789, 2006 WL 357824, at *3 (S.D.N.Y. Feb. 15, 2006) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("[C]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse.")).  That is because "[v]irtually every prisoner can assert . . . [a claim of retaliation] as to every decision which he or she dislikes."  *Flaherty*, 713 F.2d at 13.  Thus, to survive a Motion to Dismiss, a retaliation claim must be pled with specificity.  *See Ramsey v. Goord*, No. 05 Civ. 47A, 2005 WL 2000144, at *7 (W.D.N.Y. Aug. 13, 2005); *Allah*, 2004 WL 1713811, at *1; *Prince v. Edwards*, No. 99 Civ. 8650, 2000 WL 633382, at *1 (S.D.N.Y. May 17, 2000).

Read charitably, Plaintiff has alleged that his time spent in the SHU confinement cell, numerous misbehavior reports, and two incidents with corrections officers, were the products of retaliation on account of Plaintiff's "American Muslim" religious identity.  With respect to the first claim, that Plaintiff was placed in a confinement cell in retaliation for his exercise of his religion, that claim is rejected on summary judgment grounds for failure to exhaust available administrative remedies.  As noted above, no properly exhausted grievance made *any* allegations of misconduct based on Plaintiff's supposedly religious objection to the PPD test, and the one grievance that relied on this claim was never appealed.  Plaintiff cannot circumvent the exhaustion requirement by simply cloaking his claims under the guise of "retaliation."  Indeed, any allegations of retaliation based on misbehavior reports is also rejected on summary judgment grounds, because Plaintiff failed to exhaust administrative remedies available for grieving retaliation claims.  *See Lawrence v. Goord*, 304 F.3d 198, 200 (2d Cir. 2002) (noting that claim for retaliation based on misbehavior tickets issued against plaintiff had to be exhausted).

However, the Court will now consider the retaliation claim that arguably could be based on Plaintiff's two exhausted grievances.  Plaintiff alleges that two discrete events – one alleging an inappropriate comment by a corrections officer and one where a food tray was allegedly thrown at him – constitute retaliation against Plaintiff.   The first prong of a retaliation claim requires that the speech or conduct at issue was protected.  These events, if precipitated because of animus towards Plaintiff's "American Muslim" identity, arguably satisfy the first prong for a retaliation claim, because prisoners have a constitutional right to the free exercise of their religion.  *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

The second prong of a retaliation claim requires an adverse action, which is an act "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  Adverse actions are measured objectively, even if the plaintiff was not deterred.  *Id.* (citing *Davis,* 320 F.3d at 353-54).  If the adverse action is one that does not deter an individual of ordinary firmness, however, the retaliatory act "is simply *de minimis* and therefore outside the ambit of constitutional protection."  *Davis,* 320 F.3d at 353.

To determine whether retaliatory acts are *de minimis*, "the court's inquiry must be 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse.'"  *Davis v. Goord*, 320 F.3d at 353 (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)).  "Thus, in retaliation actions by prisoners, courts have found that a range of potentially retaliatory acts by prison officers are legally insufficient to state a retaliation claim."  *Salahuddin v. Mead*, No. 95 Civ. 8581, 2002 WL 1968329, at *4 (S.D.N.Y. Aug. 26, 2002).

Neither of Plaintiff's exhausted claims rises to the level of constitutional significance and both are merely *de minimis* for reasons explained in this Opinion.  *See supra* Part II.E.  The conduct at issue falls far short of crossing the threshold for adverse actions when compared to other retaliation cases which were brought forth in the Second Circuit.  *See Morales v. Mackalm*, 278 F.3d 126, 131-32 (2d Cir. 2002) (finding that an officer's reference to plaintiff as a "stoolie," intended to stigmatize plaintiff as an informant, was insufficient to support a claim for retaliation), *abrogated on other grounds by Porter*, 534 U.S. at 532*; Dawes,* 239 F.3d at 493

29

(concluding that an officer's references to plaintiff as a "rat" and an "informant," combined with plaintiff's conclusory allegations that the references exposed him to assault from other inmates, were insufficient to support a claim for retaliation); *Rivera v. Goord,* 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (dismissing retaliation claim against defendant who "shoved" an inmate on the ground that the harm was *de minimis* ).

The third prong requires a causal connection between the protected speech and the adverse action.  Courts may consider a number of factors when examining the causal connection requirement, such as:  (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.  *See Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon,* 58 F.3d at 872-73).

None of these four factors supports an inference "of a causal connection between the adverse actions and the protected conduct."  *Id*. (citing *Dawes*, 239 F.3d 432).  Plaintiff has failed to allege any series of events which plausibly could suggest that prison officials retaliated against Plaintiff for his refusal to take the PPD test.  The first factor, temporal proximity, weighs against Plaintiff.  Plaintiff refused the PPD test on May 8, 2003, and the conduct underlying his two exhausted grievances took place on September 8, 2003 and January 14, 2004, at least a full four months after Plaintiff's refusal to take the PPD test.  And, more than four months separated the first and the second alleged incident.  The lapse of time between the PPD test and the alleged retaliation strongly suggests that there is no causal connection between these events.  *See Cobian v. New York City*, No. 99 Civ. 10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) (report and recommendation) (finding a lapse of over four months, standing alone, is insufficient to

justify an inference of a causal connection in employment context), *aff'd,* 23 Fed. Appx. 82 (2d Cir. 2001); *cf. Jordan v. Garvin*, No. 01 Civ. 4393, 2004 WL 302361, at *6 (S.D.N.Y.  Feb. 17, 2004) (finding that lapse of two days permitted an inference of causal connection).  Plaintiff has only met the temporal proximity factor in the most rudimentary sense, because his refusal of the PPD test pre-dates the alleged retaliation, but that alone is not enough to meet the third prong. *See Williams v. Lappin*, No. Civ.A. 7:04CV00625, 2004 WL 3334806, at *2 (W.D. Va. Oct. 26, 2004) ("'Temporal proximity' between the inmate's protected activity and the allegedly retaliatory, official action 'is simply too slender a reed on which to rest' a § 1983 retaliation claim." (quoting *Wagner v. Wheeler,* 13 F.3d 86, 90-91 (4th Cir. 1993))).

The remaining factors also militate strongly against Plaintiff's claim:  Plaintiff has not alleged that his troubles with prison officials began on the day he refused the PPD test; the IGP has not vindicated any of his retaliation claims; and Plaintiff has not pointed to any evidence of a retaliatory motive, other than his conclusory claims.  In fact, Plaintiff has made no attempt in any of his papers to connect the officers named in the two exhausted grievances to his refusal to take the PPD test or his religious beliefs.  Only CO DiGregonio, who is not named by Plaintiff in either exhausted grievance, had a connection to the PPD test, because DiGregonio issued Plaintiff with a misbehavior ticket for his refusal to take the PPD test.  Plaintiff failed to exhaust that grievance, however.  Plaintiff's allegations are conclusory, and "[e]ven at the motion to dismiss stage . . . plaintiff must offer more than mere conclusory allegations that a causal connection existed between the protected conduct and the adverse action."  *Holmes*, 2006 WL 851753, at *15 (citing *Dawes,* 239 F.3d at 491-92); *see also Flaherty*, 713 F.2d at 13 ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the

31

pleadings alone"); *Smith v. Masterson*, No. 05 Civ. 2897, 2006 WL 2883009, at *14 (S.D.N.Y.

Sept. 29, 2006) ("Because Plaintiff has failed to make specific and detailed factual allegations

tending to show any causal connection between his success at having disciplinary charges

dismissed and the alleged conduct of the DOCS Defendants, his retaliation claim must be

dismissed.").  Because Plaintiff "has no factual basis for the claim other than an adverse

administrative decision . . . the costs of discovery should not be imposed on defendants."

*Flaherty*, 713 F.2d at 13.  Therefore, Plaintiff's retaliation claim, to the extent he alleges one, and

even if exhausted, is dismissed for failure to state a claim.

        F.  Qualified Immunity

        Defendants argue that they are protected from suit under the qualified immunity doctrine.

The doctrine applies in cases such as this one, where an inmate has brought a civil rights action

against prison officials.  *See Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *11

(S.D.N.Y. Dec. 7, 2005) (citing *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).  The qualified

immunity doctrine shields government officials performing discretionary functions from liability

if "their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see

also Wilson v. Layne*, 526 U.S. 603, 609 (1999).  A right is clearly established if (1) the

underlying law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit

recognizes that right, and (3) a reasonable defendant would understand that his conduct was

unlawful.  *See Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003).

        The "first step" in a qualified immunity analysis is to "determine whether the alleged

conduct violates any constitutionally protected right at all.  Conduct that does not violate any

constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." *Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2d Cir. 1992) (citing *Siegert v. Gilley*, 500 U.S. 226 (1991)).  Because the conduct that Sloane has properly exhausted does not rise to a constitutional violation, Defendants are entitled to qualified immunity.  The Court, therefore, need not consider the remainder of the qualified immunity inquiry.

<u>     G.  Eleventh Amendment</u>

  To the extent that Plaintiff is suing Defendants in their official capacities, such claims are barred by the Eleventh Amendment.  *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (holding claim for damages against state officials in their official capacity is considered claim against the state and, therefore, is barred by the Eleventh Amendment); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (same); *Davis v. New York,* 316 F.3d 93, 101 (2d Cir. 2002) (same).

## III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED in part and

GRANTED in part. Defendants' Motion for Partial Summary Judgment is GRANTED. The

Clerk of the Court is directed to close this case.


SO ORDERED.


Dated:        October 31, 2006
              New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

34

Service List:

Derek Sloane
(02-A-0845)
Westchester County Jail
P.O. Box 10
Valhalla, New York  10595
*PRO SE*

Benjamin J. Lee, Esq.
New York State Office of the Attorney General (24th Floor)
120 Broadway, 24th Floor
New York, New York  10271
*Office of New York State Attorney General*